WILLIAM G. AUDENRIED, JR.,

*v.*

EAST COAST MILLING COMPANY.

[Decided December 7th, 1904.]

1. In an action against the directors of a corporation to enforce a liability, under the Corporation act, for the withdrawing a part of its capital stock, it appeared that the stock was transferred to a trust company, under a syndicate agreement requiring the written consent of the syndicate managers to accept the stock of the constituent corporations for exchange for the stock of a proposed consolidated company.—*Held*, that the issue of the proposed consolidated company's stock to a constituent corporation for stock deposited within the knowledge of the syndicate managers, without objection by them, was a waiver of their formal written consent, and hence defendants could take no advantage of the failure of the managers to give their written consent.

2. In such action a judgment obtained against the corporation, of which defendant was director, is not conclusive against the defendant as to the debt sued on, where it was obtained in another jurisdiction, and the only plea interposed by the corporation was one challenging the jurisdiction of the court.

3. When a promoter induces subscriptions to the stock of a corporation on the promise that, in consideration of stock to be retained by him as a part of the plan, he will furnish certain subscriptions for the benefit of the subscribers, the promise is a part of the consideration of the contract of subscription, and hence a default on the part of the promoter in that respect vitiates the contract.

4. A provision in a certificate of incorporation that any resolution, in writing, signed by all the members of the board of directors, shall constitute action by the board, with the same force and effect as if the same had been duly passed by the same vote at a duly called meeting of the board, is not authorized by the General Corporation act.

On bill, &c.

*Mr. F. Morse Archer* and *Mr. Reynolds D. Brown* and *Mr. Charles H. Burr* (of the Pennsylvania bar), for the complainant.

*Mr. Norman Grey* and *Mr. J. D. F. Junken* and *Mr. J. B. Kinley* (of the Pennsylvania bar), for the defendant Samuel·T. Kerr.

BERGEN, V. C.

The complainant, as a creditor, seeks to compel the directors of a corporation to pay him $35,000, with interest, because, as he alleges, they have violated section 30 of the General Corporation act of this state.

The only defendant brought into court was Samuel T. Kerr, who has answered and interposed a defence. The complainant's claim is that the East Coast Milling Company, which I shall call "Milling Company," was organized January 11th, 1902, for the purpose of controlling the stock of the Eastern Milling and Export Company, which is hereinafter referred to as "Export Company," and also the capital stock of the Atlantic Flour Mills Company, the assets of these companies being the capital stock of two Pennsylvania corporations. Under a proposed plan of organization certain shares of the capital stock of the "Export Company," and all of the stock of the "Atlantic Company," were deposited with a trust company doing business in Lancaster, Pennsylvania, to be disposed of according to said plan. Between the incorporation of the "Milling Company" and the 7th day of August, 1902, efforts were made by its officers to carry out this undertaking, but determining on the latter date that it could not be accomplished, they directed the trust company to restore the stock deposited to the depositors thereof, and this was done. After the date of organization of the "Milling Company," and before the 7th day of August, 1902, the complainant asserts that the "Milling Company" became indebted to him in the sum of $34,000, for which a judgment was recovered after the latter date, and that the action of the directors in returning the stock was a withdrawal or reduction of the capital stock of the "Milling Company," in violation of said thirtieth section, by reason whereof the directors who participated in the return of the stock, of whom this defendant was one, became liable to pay his debt.

The complainant limits his claim to such stock as was actually transferred to the "Milling Company," which embraced only a portion of the "Export Company" stock, and none of the "Atlantic" shares, for although all of the stock of the latter company was deposited and returned by the same act, no claim is

made that the complainant was injured because of its restoration to its original owners.

What actually happened, so far as is material to the determination of the questions presented, was that in the latter part of the year 1901 some of the officers of the "Export Company" submitted to the defendant Kerr a proposition looking to the incorporation of a company to acquire the stock of the "Export" and "Atlantic" companies, which latter company it was proposed to incorporate to take over a large and valuable property in the city of Philadelphia, in which the defendant Kerr was largely interested, and then consolidate the two corporations. The "Atlantic Company" was incorporated and the Philadelphia property conveyed to it. After considerable negotiation a Mr. Culver, of New York City, was consulted with reference to the promotion of the proposed scheme, and he consented to act as manager, and prepared and issued a prospectus or plan, which he sent to all the stockholders of the two companies, under which their stock was afterwards deposited with a trust company.

This paper was entitled "East Coast Milling Company plan of organization and subscribers' agreement to exchange securities," and bears date January 17th, 1902, signed "Frederick F. Culver, syndicate manager." It recited that the "Milling Company" had been organized with a capital stock of $9,000,000, of which $2,000,000 in amount was preferred and $7,000,000 common stock; that the "Export Company" had outstanding bonds for $800,000, preferred stock $629,400, common stock $3,000,000; that the "Export Company," through its ownership of the stock of the Philadelphia Milling Company, a Pennsylvania corporation, controlled twenty-seven milling plants, and that the property of the "Atlantic Company," which was elaborately described, was of great value. It then proposed that the "Milling Company" should acquire at least a majority, in the aggregate, of the preferred and common stock of the "Export Company" and all of the stock of the "Atlantic Company" by exchanging the stock of these corporations for stock of the "Milling Company," and that to carry out the plan a syndicate had been formed, with Culver as manager, to whom it was proposed the "Milling Company" issue $629,400 of its

preferred stock, for which he was to deliver to the "Milling Company" an equal amount of the preferred stock of the "Export Company," or such portion thereof as should, with the common stock of the latter company, constitute a majority, in the aggregate, of both classes of stock. The plan further provided that the "Milling Company" should issue to such manager all of its common stock, in consideration of which he was to procure and deliver to the "Milling Company" such amount of the common stock of the "Export Company" as, with the preferred stock acquired, would make, in the aggregate, a majority of the stock of that company, and also a like quantity of the "Atlantic" stock. He was also to deliver to the trust company such an amount of the common stock of the "Milling Company" as would be required for the acquisition of the balance of the common stock of the "Export Company" and of the "Atlantic" stock, and that

"any balance of the said common stock of the 'Milling Company' not disposed of as above set forth shall belong to the syndicate, in consideration of their effecting the above exchange, defraying organization expenses, with the exception of legal expenses, and obtaining subscriptions at par from good and responsible subscribers for at least four hundred thousand dollars ($400,000) in amount, at par, of the preferred capital stock of the 'Milling Company,' the proceeds of which are to be used as cash working capital."

It also provided that immediately upon the issue to the syndicate manager of the preferred and common stock of the "Milling Company," the manager should deposit the same with the trust company for the purpose of making the exchanges, and that thereupon, since the balance earned by the syndicate would be $4,400,000 of such common stock, that certificates representing the same should forthwith be delivered by the trust company to said Culver, his assignees or appointees, and that certificates of stock of the "Export" and "Atlantic" companies, endorsed for transfer, subject to the control of the manager, should be deposited with the trust company upon the execution of the agreement to deposit, which was referred to in the prospectus as "the agreement hereinafter contained," and recited that "the undersigned have read and approved the foregoing

plan of organization, bearing date the 17th day of January, 1902, and assenting to the plan therein outlined do deposit" their stock with the trust company, "and do hereby sell and assign the same to the said Frederick F. Culver, manager for the syndicate, to be exchanged by said manager for securities of the 'Milling Company' hereby subscribed for upon the basis and of the kind and in the amounts specified and set forth in the plan;" and, further, that no exchange of securities should be made by the trust company until there should have been deposited with it at least $2,100,000 in amount, at par, of the preferred and common stock of the "Export Company," and all but three shares of the "Atlantic" stock.

Under this plan at least a majority of the stock of the "Export Company," and all of the "Atlantic" stock required, were deposited, and certificates were issued to the "Milling Company" on the 19th day of April, 1902, for thirty-nine thousand and thirty-seven shares of the common, and six thousand nine hundred and thirty-seven shares of the preferred stock of the "Export Company." The minutes of a special meeting of the board of directors of the "Milling Company," held on the 7th day of August, 1902, show that it was resolved that, as there had been delivered to the "Milling Company," pursuant to said plan, six thousand nine hundred and thirty-seven shares of the preferred and thirty-nine thousand and thirty-seven shares of the common stock of the "Export Company," for which new certificates had been issued to the "Milling Company," and that it was deemed to be for the best interest of all concerned that the plan of organization should not be carried out, and that the stock of the "Export Company" so issued to the "Milling Company" should be returned to the trust company, to be redelivered to the original depositors, and that all other stock of the "Export Company," and the stock of the "Atlantic Company" deposited with the trust company under said plan should be returned to the holders of the trust receipts which had been issued under the terms of the plan, and that the company consented to the abandonment and rescission of the plan, and directed the syndicate manager and officers of the company to take the necessary steps to carry out the resolution.

In pursuance of this action the stock referred to was properly transferred to the trust company for distribution, and it, together with the other shares of stock deposited under the plan, was returned to the original holders and depositors. The transfer of this stock is the act which the complainant claims constitutes the violation of the statute upon which he rests his right to a decree.

The insistment of the defendant is that the plan never became effective because its terms had not been complied with, and also because the financial condition of the "Export Company" had been so grossly misrepresented as to justify the stockholders of the "Atlantic Company," whose stock had not been transferred, in withdrawing their deposits of stock, without which the plan could not be carried out, and that the transfer of the stock of the "Export Company," issued to the "Milling Company," was procured by the syndicate manager without the right to do so, as he held it in trust, upon terms not fulfilled.

As to the charge that the terms of the agreement had not been complied with, it is insisted, first, that it does not appear that any of the preferred or common stock of the "Export Company" had been accepted for exchange with the written consent of the syndicate manager and Andrew J. Toomey, as the plan required. I am not disposed to accord much force to this objection, because the issue to the "Milling Company," in exchange for stock deposited, was within the knowledge of the syndicate manager and Toomey, and they having made no objection, should be considered as waiving the formal written consent.

The second insistment under this head presents a more serious question. The plan contained a statement that one of the considerations for the stock issued to the syndicate manager as earnings was the obtaining from responsible persons subscriptions for $400,000, at par, of the preferred stock of the "Milling Company," to be used as working capital and for the erection of the plant and mills of the "Atlantic Company," and it is admitted that efforts were made to secure this subscription, without success. The complainant contends that the procuring of these subscriptions was not necessary to the binding of the depositors, and that when their stock was deposited and transferred the

title passed to the "Milling Company," without regard to the fulfillment, by the manager, of the part of the plan now under consideration, and that such depositors are bound by their agreement as an independent contract, separate and distinct from the plan proposed. To this contention I cannot give my approval. In my judgment, all of the statements of the syndicate manager, as contained in the prospectus issued by him, constitute a part of the agreement, of which obtaining subscriptions for $400,000, to be used as working capital and for the erection of the "Atlantic" mills, was an essential element. It was a recital in the proposed plan which would be alluring to the holders of the stock proposed to be exchanged, and was undoubtedly a potent factor in persuading them to accept it. Without it there was no substantial inducement to make the exchange, and upon the failure of the syndicate manager to carry out the promises held out by him the persons who had deposited their stock were in equity entitled to its return; they demanded it, and the officers of the "Milling Company," recognizing the failure of the plan, only did what they could have been compelled to do. The stock was deposited upon the understanding that all of the proposed plan should be carried out, not a part of it, and until the manager to whose order the stock was deposited was in position to execute the whole trust, he had no legal right to transfer any of the stock, and the depositors were not required to accept the "Milling Company" stock in exchange unless the "Atlantic" stock was also transferred, and it is not pretended that it ever became the property of the "Milling Company," and for that reason a part of the consideration for the exchange failed.

By the terms of the agreement the syndicate manager was to have transferred to him a large part of this stock, the ownership and possession of which made him an influential factor in the management of the company, and entitled him to a share of the profits, in common with stockholders who were surrendering property as a consideration for the stock to be issued to them. For the stock issued to him as earnings, the manager agreed to obtain subscriptions for the preferred stock to the amount named, and the depositors of stock, who were in fact

subscribing for the new stock, could not be held for their subscriptions until this preferred stock was subscribed for, because they understood, and had a right to understand, that if they subscribed they were to be aided by subscriptions to the preferred stock. It is a general rule that it is an implied part of a contract for subscriptions that the contract is to be binding and enforceable against the subscriber only after the full capital stock has been subscribed. *1 Cook Corp. 357 § 176.* This rule is subject to the qualification that parties may agree to commence business with a smaller subscription, as was done here, but, on the other hand, when a promoter induces subscriptions on the promise that, in consideration of stock to be retained by him as a part of the plan, he will furnish subscriptions to stock for the benefit of the subscribers, that promise is a part of the consideration entering into the contract of subscription, and a default on the part of the promoter avoids the contract.

In addition to the prospectus, the syndicate manager issued and sent to the stockholders of the "Export Company," of whom the complainant was one, a circular letter, dated March 1st, 1902, addressed to the stockholders of the company, setting forth, among other things, that the manager reserved the right, at any time in his discretion, to wholly abandon the transaction, in which event all stock deposited was to be returned to the depositors, so that at the time the complainant's debt was created he had knowledge that the manager might, in his discretion, abandon the transaction, and he entered into the arrangement he sets up, with full knowledge that the stock to be acquired might never be assets upon which he could rely.

As to the charge of misrepresentations, it must be remembered that the complainant was, at the time they are alleged to have been made, the president of the "Export Company," and properly chargeable with knowledge of the financial condition of that company. In order to induce deposits and to secure subscribers to the preferred stock of the "Milling Company," a circular was issued, which contained, among other things, a statement of the company, signed by "David R. Locher," the treasurer of the "Export Company," he being the principal witness for the complainant, and the person who managed the sale

of complainant's stock to the "Milling Company." This statement bears date January 24th, 1902, and was addressed to the defendant Kerr, as president of the "Milling Company," and stated the net profits of the "Export Company," for six months prior to December 31st, 1901, to be $144,618.39. There was also in evidence a report of the Federal Audit and Transfer Company, purporting to show the condition of the "Export Company," on March 18th, 1902, but as this report expressly states that it was prepared in accordance with figures shown on the books of the "Export Company," it has little value as a disclosure of the true condition of the company. Some time after a more careful audit was made by the same accountants, showing the condition, as of March 18th, 1902, of the Eastern Milling and Export Company of Pennsylvania, the stock of which constituted all the assets of the "Export Company." This auditing disclosed that instead of a profit of $144,000 on the 31st of December there was an actual loss in the business, on March 18th following, of over $90,000, or a difference of about $230,000, and it is not pretended that this great loss occurred between December 31st and March 18th.

I am entirely satisfied, on this branch of the case, that the officers of the "Export Company" knowingly misrepresented the condition of their company for the purpose of inducing the "Milling" and "Atlantic" companies to exchange stock. It further appears that after considerable of the stock had been deposited it was discovered by the officers of the "Milling Company" that the complainant, as president of the "Export Company," had, without any authority, endorsed accommodation paper, with the name of that company, to the extent of $64,000; that when his attention was called to it he agreed to relieve his company from such liability by the 10th of May, 1902; that he did not fulfill this agreement on the date specified, and although during the summer of 1902 he had partly done so, he did not complete it until after the resolution to abandon the enterprise was adopted. The testimony also shows that sufficient stock of the "Milling Company" was never deposited by the syndicate manager to provide for the exchange of all the stock deposited,

and that to such extent he did not carry out his part of the agreement.

I will next consider the character of the complainant's claim. It seems that he, although president of the "Export Company," having knowledge of its financial condition, declined to deposit his stock for exchange under the proposed plan, and that the "Milling Company," by a resolution, not adopted at a meeting of its board of directors, but signed by them at different places, agreed, as the complainant alleges, to purchase from him one thousand shares of the preferred stock and two thousand shares of common stock of the "Export Company," for $34,000, payable October 1st, 1902, in bonds of the Atlantic Flour Mills Company, or in cash, if the bonds were not delivered. As the bonds were not delivered owing to the failure of the plan, the complainant brought suit against the "Milling Company" in the United States circuit court for the eastern district of Pennsylvania, and recovered a judgment against the company for the full amount claimed, with interest. The transcript of that judgment was offered in evidence and admitted, after proof satisfactory to me that process was duly served on an officer of the company residing in that state where it was carrying on business, although the only plea interposed was one which challenged the jurisdiction of the court. This record is proof of the fact that such a judgment was recovered against the company, and, so far as it was concerned, would establish a debt upon which recovery might be had in the courts of this state, but on the hearing I was of opinion that the record was not conclusive against the defendant as a director, proceeded against under the thirtieth section of the Corporation act; nor would it be even if the judgment was domestic and not of another jurisdiction, as in this case, and further consideration of the question has strengthened my conviction that it was necessary to support the claim with proof of the sufficiency of the original obligation of the company to the extent required if no judgment had been recovered. The complainant, while protesting against the correctness of this conclusion, undertook to establish his debt by evidence other than the record. As that evidence may be insufficient, in which event the question of the conclusiveness of the record as proof of

the debt becomes important, I feel called upon to give some of the reasons which control me on this point.

The thirtieth section of our Corporation act, while not strictly penal in its character, imposes a liability, not arising from any contract, but because of the misfeasance of a director. As it would be a great hardship to hold a director liable for the amount of a judgment recovered against a company in an action to which he was not a party, upon the ground that a corporation ought not to have the power to suffer a recovery, and thereby bind the director, without further proof, to the payment of a debt which, if properly resisted, might have no legal existence, such judgment ought not to be held conclusive unless the weight of authority sustains so severe a construction, especially in a case like this, where it appears from the record that the judgment was recovered without any defence by the company as to the merits, the recovery being practically by default.

Many cases which I have examined relate to actions against stockholders for non-payment of subscriptions for stock, as distinguished from proceedings against an officer for a misfeasance, and, while they are alike in character, there is a distinction in favor of a director, pursued, not for a debt due to the company on a subscription, or on any previous obligation assumed by him, but upon a liability created by statute. In *Miller* v. *White, 50 N. Y. 137,* the action was against directors for the omission of a statutory duty. The trial court held that a judgment recovered against the company was not only *prima facie,* but conclusive, evidence of the debt as against the defendants. This was unanimously reversed by the court of appeals, and it was there held that the directors were not bound by the judgment, nor was it even *prima facie* evidence against them, Judge Peckham saying: "There is no hardship in requiring a party to prove his case against these defendants. If he has sold the company goods, loaned it money or rendered it service, it is easily proved in this action. It seems to me that connivance and fraud are prevented by requiring such proof."

In *McMahon* v. *Macy, 51 N. Y. 155,* the majority of the commissioners of appeals held that a judgment against the com-

pany is not even *prima facie* proof of the debt against a director sought to be held.

In *Stephens* v. *Fox, 83 N. Y. 313*, it was held, in a suit by a creditor against a stockholder for unpaid subscriptions, that a record of a judgment against the company was sufficient evidence of the debt, because the stockholder was indebted to the company and the creditor was subrogated to the company's right; but, referring to *Miller* v. *White, supra,* the court said: "The defendant was not pursued as a debtor to the corporation, or for any pre-existing liability of his own, but upon an original liability created by the statute, and it was not in the power of the corporation to admit away his case, or suffer a recovery which should be binding upon him, and create, as against him, a liability to which he was not previously subject;" but, in a proceeding for unpaid subscriptions, "whether the company owed the debt or not was of little consequence to the stockholder, and did not affect his liability to the company. He was bound to pay to the company even if there was no creditor."

In *Allen* v. *Clark, 108 N. Y. 269*, the action was based upon the failure of the directors to file an annual report, and the record of a judgment against the company for costs was held to be *prima facie* evidence of its existence, the conclusion being put upon the ground that the judgment against the company had been recovered prior to the date fixed for filing the annual report, and that it being then an existing debt it became the duty of the directors to make it known by such report. The opinion in this case, however, distinguished it from *Miller* v. *White, supra,* because the judgment in the latter case rested upon a debt "antecedently existing," the distinction being that in *Miller* v. *White* the judgment was recovered after the default, while in the case the court was then considering the judgment existed as a debt of the company prior to the default. The principle established in *Miller* v. *White* has never been repudiated by the courts of New York. There are a number of cases relating to suits brought by creditors to compel payment of unpaid subscriptions to stock which were cited for complainant, and which I have examined, as in *Stutz* v. *Handley, 41 Fed. Rep. 531; Powell* v. *Railroad Company, 38 Fed. Rep. 187; Glen* v. *Springs, 26 Fed.*

*Rep. 494*, but they are not controlling, because they clearly rest upon a different basis from suits brought to enforce a statutory non-contractual liability imposed upon a director for violation of a statutory duty.

In *Tabor* v. *Commercial National Bank, 62 Fed. Rep. 383*, it was held, under the Colorado statute requiring annual reports to be filed by the directors, and in case of failure imposing a personal liability for the debts of the company, that a complaint which counted upon a judgment, and did not plead the original debt, was good, and under the statute of Colorado the judgment might be introduced in evidence to prove the debt it established. In this case judgment was recovered against the company before the last default of the directors, and the question to be settled was whether the judgment was a debt of the corporation, for which the director was liable, within the meaning of the statute he was construing.

A careful comparison of the statutes of New York and Colorado shows they are substantially the same, and the court, in determining the case last cited, states that the result reached is contrary to the doctrine held by the courts of New York on this subject. The law, as established in New York, has, however, been approved by the supreme court of the United States. That court, in considering the New York statute, rejected the judgment against the corporation as either evidence or ground of liability against the directors, and founded the liability upon the obligation of the corporation, on which the judgment itself rested. *Chase* v. *Curtis, 113 U. S. 452*. It seems to me that sound reason and the weight of authority uphold the proposition that it would be inequitable to hold that a judgment recovered against a company is conclusive against a director; but, on the contrary, it is the duty of the complainant, under facts similar to those shown in this case, to satisfy the court, as a part of his case, that the original obligation upon which the judgment against the company is founded is of such a character as to make him a creditor of the company holding a claim which, in equity, he should be allowed to enforce against a director under the statute invoked.

Having concluded that it is incumbent upon the complainant

to substantiate his claim by evidence other than the record of his judgment, I will next consider whether he has done so. The complainant was president of the "Export Company," and the holder of considerable of its stock, nearly, if not all, of which he had pledged as collateral for personal loans. Between the 17th day of January, 1902, and the 8th day of March following, he had, through Mr. Locher, the treasurer of his company, endeavored to sell his stock in the "Export Company" to the "Milling Company." The sale was effected through Mr. Locher, who suggested that the complainant "put himself in his hands," the result of which seems to have been the signing of a resolution, which Mr. Locher prepared and passed from one to another of his co-directors for signature. This resolution was not adopted at a regular meeting of the board, nor do the minutes of the company show that it was ever approved; it bears date the 8th day of March, 1902; is signed by the directors and pasted in the book of minutes, succeeding an entry of amendments to the company's charter filed March 18th, 1902. This paper recited that in the opinion of the board of directors it was to the interest of the company that it acquire, by purchase from the complainant, certain shares of his stock in the "Export Company," in the manner and upon the terms above set out. It also appears the complainant secured certain certificates of the "Milling Company," signed by Mr. Locher, as treasurer, and Mr. Toomey, as vice-president, but as these certificates were issued without any authority from the board of directors, and are not the obligation provided for in the original resolution, they have no force in establishing the complainant's claim. The testimony shows that during the summer of 1902 Mr. Toomey and Mr. Locher, without the knowledge of the board of directors of the "Milling Company," were issuing certificates and the notes of that company to the complainant, to assist him in his private business affairs. This irregular conduct, participated in by Locher, Toomey and the complainant, and the manner in which this sale was brought about, excites my suspicion and leads me to doubt their integrity in the transaction. The complainant was president of the company whose stock he sought to sell, chargeable with knowledge of its financial condition, and Mr. Locher, his active agent in

the matter, was treasurer of the company, and also an officer of the purchasing company, and knew of the unsound condition of the "Export Company," and instead of calling a meeting of the board of directors to consider the matter he prepared a resolution (which the complainant saw before it was signed, for he said he approved of it) providing for the purchase of the stock, and procured the signatures of the directors to it, his name appearing first. The fact that the certificate of the corporation provided that the directors might adopt resolutions in this manner does not aid the *bona fides* of the act, for this most important act of the board is the only one where this peculiar provision was availed of, and I am convinced from the relations existing between the complainant and Mr. Locher that it was instigated by the complainant and carried out in the manner indicated for the purpose of avoiding a discussion of the proposed action, such as would likely arise if submitted at a board meeting.

I cannot resist the impression created by the evidence that Mr. Locher, with full knowledge of the unsound condition of the "Export Company," undertook, as the agent of the complainant, and with his knowledge, to impose upon his fellow-directors, and thereby effect a sale of this amount of stock, most, if not all, of which could not be delivered because it was held in pledge by the complainant's creditors, and in order to allow the complainant to relieve the stock and deliver it, unlawfully used the credit of the company for that purpose.

It is insisted, on behalf of the defendant, that when this agreement to purchase was made the true condition of the "Export Company" was not made known; that this complainant, as president of that company, had full knowledge of its weakened condition; that Mr. Locher, as its treasurer, when acting for the complainant in the sale of this stock, and in inducing the directors of the "Milling Company" to sign the resolution, also concealed the condition of the company, and that this misrepresentation and concealment of the truth was a fraud upon the "Milling Company," which justified it in refusing to accept the stock. It is also claimed by the defendant that when the negotiations for the sale of this stock were proceeding it was not known

that the complainant, as president of the "Export Company," had pledged the credit of that company as an accommodation endorser to the extent of $64,000; that before the resolution was signed agreeing to purchase this stock it came to the notice of the defendant, and he protested that he would not become an officer of that company, nor agree to the purchase of the complainant's stock until this obligation was removed, and that the complainant agreed to relieve the company from its endorsement on or before the 10th day of May next following; that while the complainant did, during the summer of 1902, and after the 10th day of May, relieve the company from some of its liability, it is admitted that the liability was not extinguished until long after the "Milling Company" had abandoned the effort to effect the purpose for which it was created and had directed a return of the stock. The complainant denies that the extinguishment of this endorsement was a condition to be performed before the sale of the stock became effective. I am not disposed to take his view of the case. I believe what the defendant Kerr says on this subject, not only because his appearance and manner as a witness satisfies me that he told the truth, but also because his contention is the natural one.

My conclusion on this branch of the case is that the complainant, with the aid of Locher, was guilty of a fraud upon the directors of the "Milling Company" when the sale of his stock was made, and that the agreement would never have been made if the complainant had disclosed the true condition of his company, instead of permitting this defendant and his codirectors to rely upon the misstatement made by Mr. Locher, as treasurer, and that a court of equity should not hold this to be an obligation for which this defendant is liable. I also find that the complainant agreed to extinguish the endorsement objected to by May 10th, 1902, and that he did not comply with his agreement.

The defendant also insists that the debt of the complainant, at the time of the transfer of stock of which the complainant complains, was not an obligation of the company, because no lawful corporate action, looking to that end, was ever taken by

the board of directors acting as a board, and that the pretended resolution, although signed by all of the directors, was not, and could not be, the act of the corporation, and he invokes the well-settled rule that where the management of the affairs of a company are committed to a board of directors, they cannot act separately. It is not denied that the official action of the board upon which the complainant relies depends upon the efficacy of a resolution not adopted at a meeting of the board, but prepared and carried from one to another of the directors, by whom it was signed, each director acting independently of the other, and without conference. The complainant not denying that such official action was obtained in this manner, attempts to justify it under the authority conferred by the certificate of incorporation contained in the following clause:

"Any resolution, in writing, signed by all the members of the board of directors or executive committee, shall be and constitute action by such board or executive committee, as the case may be, to the effect therein expressed, with the same force and effect as if the same had been duly passed by the same vote at a duly called meeting of such bodies, respectively, and it shall be the duty of the secretary of the company to place such resolution, as signed, in the minute book of the company under its proper date."

As the complainant rests his right upon a resolution adopted in that manner, it becomes important to ascertain whether the power attempted to be conferred by this clause is supported by the law under which the articles of association were filed. When authority to manage the affairs of a corporation is vested in a board of directors it is conferred upon them as a board and not as individuals. If they act or give their consent separately, and not as a board, their conclusion is not the action of the corporation, although all may consent, and the corporation is not bound, in the absence of ratification. *Clark & Marsh. Corp. 2074 § 677; First National Bank of Fort Scott* v. *Drake, 35 Kan. 564; 57 Am. Rep. 193.*

This eminently wise and just rule, the complainant claims, may be abrogated by persons incorporating themselves under the General Corporation act of this state, and he relies upon subdivision 7 of section 8 of the act, which permits any provision which the incorporators may choose to insert

"for the regulation of the business, and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders, or any class or classes of stockholders; *provided,* such provision be not inconsistent with this act."

If the power to legislate as these incorporators have legislated exists, it must be found in the expression, "any provision creating, defining, limiting and regulating the powers" of directors.

Under this clause, it is insisted that the legislature has granted the right, not only of creating, defining, limiting and regulating the powers of the corporation, but also the right to authorize the directors to exercise the powers thus established according to any method the incorporators may see fit to adopt, although the power to do this is not granted in express terms. I do not so interpret these words. The right "to create" is limited to the establishing of or regulating a power to be exercised by the corporation through its directors, which power shall not be inconsistent with the terms of the general act. The method of exercising the power created must conform to settled legal principles, unless it be otherwise distinctly authorized by the legislative act. No such express authority is conferred by this act and it ought not to be inferred from ambiguous expressions.

To hold that the legislature of our state, by the adoption of our General Corporation act, intended to confer upon individuals an indefinite power of legislation, would require the adoption of a liberality of construction which the act does not warrant, and which upon every known principle is contrary to public policy. The act is, by its terms, sufficiently broad, elastic and liberal, and I am unwilling to read into it any such power as this complainant insists upon, for, in my judgment, it is only a board duly convened and acting as a unit that is made the representative of the company. Nowhere in this act is it intimated that a board of directors may act independently or otherwise than as a united body, counseling with each other with regard to every determination that may affect the corporation. On the contrary, it requires that the business of every corporation shall be managed by its directors, and that all votes of the corporation and directors shall be recorded by the secretary in a book to be kept

for that purpose, which we must assume means that this secretary, who is required to be a sworn officer, shall be present and record the votes of the directors.

The proposition that the stockholders, in assenting to this provision in the articles of association, waived the advantage and protection they would enjoy under the common law and our Corporation act, does not meet the case. Stockholders may waive an advantage, but they cannot by waiver ordain a method of corporate action which the law does not recognize, nor dispense with the aid of a board of directors as a means of corporate action. Such a course is not sanctioned by our law and is inconsistent with the twelfth section of our act, which requires that "the business of every corporation shall be managed by its directors." But we ought not to confine the consideration of this question to the relationship existing between the stockholders and the directors. The business of the state is to a large extent carried on by corporations, and their transactions directly and vitally affect the interests of all the people. In committing the transaction of business so generally to corporations, the legislature may be presumed to have provided for and recognized deliberative meetings of directors as a safeguard to the public interest, which presumption ought not to be overthrown by a forced construction of the act. The fundamental idea of a business corporation involves an advantage coming from the aggregation of wisdom, knowledge and business foresight which results from bringing a large number of stockholders and directors into a common enterprise. It is their knowledge and wisdom combined, acting as a unit, that gives efficiency and safety to the corporate management.

I am satisfied that the section of this charter now under consideration is contrary to the provisions of our Corporation act, and that there is no express or implied authority conferred thereby which will allow a corporation to determine, in its articles of association, that its board of directors may avoid the performance of their duties in the manner required by the word and spirit of our act and the well-settled law on that subject. To permit it would engraft upon the law a vicious and dangerous power, and in the absence of express legislative authority I am

unwilling to sanction it.  It therefore follows that the separate and individual acts of these directors created no liability against the company, and that if no liability existed the complainant has no obligation which he can enforce against this defendant, unless this irregular act has been ratified, or the corporation, because it has received the benefit of the contract, is equitably bound to respond.  As to the ratification, the book of minutes shows that this resolution, which bears date March 8th, 1902, was pasted therein some time after March 18th, 1902; that pursuant to a notice stating that a meeting of the board of directors of the company would be held in New York City on April 24th, 1902, for the purpose of ratifying all past acts of the directors and for the transaction of other business, a meeting was held; that the proceedings of this meeting show that the minutes of a meeting held February 14th, 1902, were read and approved; that no reference was made to the resolution of March 8th; that the next meeting was held on the 7th day of August, at which no previous minutes were read or approved; that the next meeting was held September 11th, 1902, when only the minutes of April 24th and August 7th were approved.  At this meeting the defendant referred to the resolution of March 8th, and reported that it was erroneous in that it did not express the consideration of the sale, and a resolution was adopted by the company rescinding, annulling and vacating the resolution, and disaffirming all of the transactions relating thereto.  At a meeting held in Jersey City on the 6th day of November, 1902, Mr. Lord, who was then president of the company, made a report upon this matter, and it was resolved that the company disaffirm all the transactions between Locher, Toomey and the complainant, not only with reference to the purchase of the stock, but of the issue of certificates and the exchange of notes, to which I have hereinbefore referred.  There is nothing in the minutes of the company showing a ratification of the individual acts of the directors on March 8th; on the contrary, they protest against it vigorously.  But even if the minutes of the two latter meetings could be held to be a ratification, it happened long after the stock had been returned and the commission of the default with which the defendant is charged, and he would not

be bound by a ratification after that time because at the time he committed the offence he is charged with the company was under no legal obligation.

As to the delivery of a part of the stock to the company, the evidence shows that it was done by the complainant through his two friends, Mr. Toomey and Locher, without the knowledge of the board of directors, and never came to their notice until after the abandonment of the proposed plan.

It was argued, on behalf of the defendant, that the act complained of was not such as section 30, above referred to, defines, and that section 30 was confined in its operation to "capital stock" as distinguished from "capital," and that therefore the defendants had not divided, withdrawn or paid to the stockholders its capital stock. In my judgment, the words "capital stock," as used in this section, can have no other meaning than that it is such part of the property of the company as represents its capital, for which the stock was issued, and if the defendant, as a director, has aided in withdrawing a portion of the assets of the company, in violation of the statute, he would be liable to creditors for the amount placed beyond their reach. The complainant undertook to establish the value of the stock returned to the depositors by proof of sales of the stock nearly a year prior to the alleged unlawful disposition of it. But this evidence must be considered in connection with the fact that the sales were made shortly after the company was reorganized, during the first six months of its business, and before any statement of its profits had been or could be ascertained. The only shares, that I now recall, being sold after January 1st, 1902, were bought for the purpose of qualifying the defendant, and perhaps one other, for directorship, without reference to the intrinsic or market value thereof, and, while I have disposed of this case on other grounds, I doubt whether, on August 7th, 1902, when it was decided to return this stock to its depositors, it had any intrinsic value; certainly there is no proof that it had any market value.

The conclusions which I have reached are as follows—*first,* that the stock of the "Atlantic Company" and of the "Export Company," deposited under the agreement, never became the

property of the "Milling Company," and that the syndicate manager, in whose name it was deposited, never acquired the right to make the exchange or to have any of the stock so deposited transferred to the "Milling Company;" *second,* that the financial condition of the "Export Company" was so misrepresented that the "Milling Company" was not bound to accept the stock of that company, and that the depositors of the stock of the "Atlantic Company" were justified in demanding a return of their stock, without which the plan could not become effective, and failing in such an essential particular the stockholders of the "Export Company" were justified in demanding a return of their deposits; *third,* that the stockholders of the "Export Company," and of the "Atlantic Company," were entitled to have the syndicate manager secure a working capital of $400,000; that this statement in the plan of organization was an important and essential one, and that the "Atlantic Company" was entitled to have the benefit of at least a portion of that fund as a consideration for their deposits, and that the failure of the syndicate manager to secure subscriptions to the preferred stock to that amount justified the depositors in withdrawing their stock; *fourth,* that the debt of the complainant is not of such a character as to justify a court of equity in aiding in its enforcement against this defendant, and that the terms of the act under which it is sought to support this claim ought to be strictly construed against this complainant, and every equitable advantage accorded to the defendant, for while it has been held by the highest court in this state that the section under consideration is not penal in its character to such an extent that it ought not to be enforced in a court of equity, and that its sole purpose is not to punish, but to provide for the making of compensation by wrong-doers to one injured by their unlawful act (*Appleton* v. *American Malting Co.,* 65 *N. J. Eq.* (*20 Dick.*) *375*), I do not understand that to mean that it should be given as liberal a construction as it would be entitled to if the default grew out of a contractual relation. It is not strictly penal in that the dereliction prescribed can be punished as a crime or considered an offence against the state, but it does impose a liability to pay a corporate debt whenever the director shall act contrary to its

restrictions or prohibitions, and not because of any contract entered into by him, and, while remedial as to creditors, it is to a degree penal as respects the officer to which it applies, and is to be governed by some of the principles which apply to strictly penal statutes. *Clark & Marsh. Corp. 2654 § 833c; Huntington v. Attrill, 146 U. S. 657.*

Under the views above stated the complainant has not presented a case which commends itself to a court of equity, and in my judgment equitable aid ought not to be extended to him. I will therefore advise a dismissal of the bill of complaint.